Jacky Clay REYNOLDS, Appellant,

v.

The STATE of Texas, Appellee.

No. 06–05–00154–CR.

Court of Appeals of Texas,
Texarkana.

Submitted Nov. 14, 2006.

Decided May 31, 2007.

Phil Smith, Sulphur Springs, for appellant.

Timothy Rountree, Asst. Dist. Atty., Sulphur Springs, for appellee.

Before MORRISS, C.J., CARTER and MOSELEY, JJ.

## OPINION

Opinion by Justice CARTER.

Jacky Clay Reynolds was convicted of attempted indecency with one child by contact and was acquitted of a separate count of indecency with a child (F.S.) by contact.[1] Reynolds entered a plea of "[n]ot true" to the enhancement allegations contained in the indictment. After the jury made findings of "true" on two alleged enhancement paragraphs, Reynolds was sentenced to ninety-nine years' imprisonment. He appeals the conviction, alleging the following errors: (1) the jury charge on punishment failed to instruct the jury that it must find Reynolds' prior felony convictions used to enhance punishment "true" beyond a reasonable doubt; (2) a State's witness was allowed to testify as to the ultimate truthfulness of the child complainant; (3) the wrong person was allowed to testify as an outcry witness; and (4) a State's witness was improperly allowed to offer expert testimony.

Reynolds does not challenge the sufficiency of the evidence. This case involved a child Reynolds was babysitting on the night of March 24, 2004.

## I. The Punishment Charge Failed to Require that Prior Felony Convictions Used to Enhance Punishment be Proved Beyond a Reasonable Doubt

■ Reynolds' first point of error complains that the trial court's punishment

---

1. In a joint trial, involving another child, Reynolds was also convicted of two other counts of indecency with a child (C.S.) by contact and was found not guilty of aggravat- ed sexual assault of a child. The opinion in that case is issued this date in cause number 06–05–00155–CR.

charge did not require that Reynolds' prior felony convictions, alleged by the State to enhance his range of punishment,[2] be proved beyond a reasonable doubt. Reynolds' other arguments are based on the failure to so instruct the jury. He argues the trial court improperly instructed both parties as to the proper burden of proof on that issue and allowed the State to describe an improper burden of proof to the jury in closing arguments.

■ The trial court's charge to the jury on punishment did not require that Reynolds' prior felony convictions, relied on by the State for sentence enhancement purposes, be proved beyond a reasonable doubt. The State is required to prove beyond a reasonable doubt prior convictions alleged for enhancement. *See Ex parte Augusta*, 639 S.W.2d 481, 485 (Tex. Crim.App.1982), *overruled on other grounds by Bell v. State*, 994 S.W.2d 173 (Tex.Crim.App.1999); *see also Sanders v. State*, 69 S.W.3d 690, 693 (Tex.App.-Texarkana 2002, pet. dism'd, untimely filed) (citing *Augusta*, 639 S.W.2d 481; *Williams v. State*, 899 S.W.2d 13, 14 (Tex.App.-San Antonio 1995, no pet.)); *Martinez v. State*, 969 S.W.2d 139, 140–41 (Tex.App.-Fort Worth 1998) (defendant pleading not true to enhancement allegations entitled to *Geesa*[3] instruction), *rev'd*, 4 S.W.3d 758 (Tex. Crim.App.1999) (no requirement of *Geesa* instruction).

Reynolds affirmatively stated he had no objections to the trial court's punishment charge. It is useful, however, to reproduce the objections and comments made in closing argument. During his closing argument to the jury at the punishment phase, Reynolds' counsel referred to penitentiary ("pen") packets the State had offered to prove Reynolds' prior felony convictions. Counsel said, "You have to prove beyond a reasonable doubt—." The State then started to object, "Your Honor, I don't believe that's—that's proper. I don't think that's right. I'll withdraw my objection. . . ." Next,

> [Counsel for Reynolds]: . . . You have to prove beyond a reasonable doubt that these convictions—
>
> [The State]: Your Honor, I'm going to object to him going outside of the Jury Charge and—which is not in there, and—I mean, I'll let him argue his case. . . .

Reynolds' attorney continued to assert in his argument that the State could not prove, beyond a reasonable doubt, that Reynolds was the person previously convicted in the judgments contained in the pen packets. During the defense closing argument, the trial court asked the attorneys to the bench. The conference was not transcribed, but both parties indicate that the trial court told them the standard for proving prior convictions was by a

---

**2.** *See* Tex. Penal Code Ann. § 12.42(d) (Vernon Supp.2006).

**3.** *Geesa v. State*, 820 S.W.2d 154 (Tex.Crim. App.1991). In *Geesa*, the Texas Court of Criminal Appeals defined the term "beyond a reasonable doubt" and mandated that the definition should be included in the jury charge. In *Martinez*, the jury charge contained the requirement that the enhancement allegations must be proved beyond a reasonable doubt, but failed to include the *Geesa* definition of the term in the punishment charge. The Fort Worth court found that to be error, but the

Texas Court of Criminal Appeals reversed and found that the *Geesa* definition was unnecessary at the punishment charge in the absence of a request. *Martinez*, 4 S.W.3d at 759. The fact that the jury must be instructed to find the enhancement allegation true beyond a reasonable doubt was never questioned. Ultimately, the Texas Court of Criminal Appeals overruled *Geesa* and the term "beyond a reasonable doubt" is no longer defined in the jury charge. *Paulson v. State*, 28 S.W.3d 570, 573 (Tex.Crim.App.2000).

preponderance of the evidence.[4] The trial court erred in omitting from the punishment charge a requirement that the enhancement allegations be proved beyond a reasonable doubt.

This error occurred at punishment. The State's punishment evidence consisted of the Sulphur Springs assistant chief of police, Robert Stidham, and one of Reynolds' neighbors. Stidham compared fingerprints obtained from Reynolds after the jury's guilty verdict to fingerprints in Reynolds' pen packets. He testified that the fingerprints he took from Reynolds matched the fingerprints in the pen packets bearing Reynolds' name and identifying information. Stidham also identified Reynolds from the photographs in the pen packets. Freddy Roberts testified he had lived for years next door to the house where Reynolds and his mother had lived. Roberts said he was aware Reynolds had "gone away" for a time, but did not know personally whether Reynolds had gone to prison.[5]

Reynolds did not object to the trial court's charge until it had been read, argued, and submitted to the jury. We therefore will treat this as unobjected-to error, requiring Reynolds to prove he suffered egregious harm. *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1984) (op. on reh'g). The jury charge included an instruction that the jury, before considering an extraneous offense, must find that such offense was true beyond a reasonable doubt.

In punishment trials, several types of evidence may be presented. If the State has alleged that the defendant has been previously convicted of felony offenses and is seeking to enhance the punishment to a higher level, it must prove those allegations beyond a reasonable doubt. *Augusta,* 639 S.W.2d 481; *Williams,* 899 S.W.2d at 14; *see Flowers v. State,* 220 S.W.3d 919, 920–21 (Tex.Crim. App. 2007) (indicating that, while certified copies of final judgments and sentences may be a preferred means of proving the prior conviction, it is not the only method).

Generally, enhancement allegations are proved by introducing pen packets which contain copies of the judgments of the previous convictions and fingerprints of the defendant who served the sentence in the Texas Department of Criminal Justice (TDCJ). Even when the State is not seeking to enhance punishment, it may seek to introduce evidence of the defendant's prior criminal record for the jury to consider in assessing punishment. Again, this is often done by introducing pen packets or judgments of conviction. However, in the latter case, the Texas Court of Criminal Appeals has held that, in such instances, when identity is not an issue, it is not necessary to instruct the jury that the State must prove the previous convictions beyond a reasonable doubt, as the convictions themselves necessarily evidence that the defendant was guilty be-

---

**4.** Reynolds asserts this in his brief. And the State said in its closing argument, "it's not beyond a reasonable doubt." Later, after the jury retired for deliberations, Reynolds made an objection that the jury had been given the wrong burden of proof for the prior convictions. In that discussion, Reynolds' attorney said, "the Court instructed us that, that it was not beyond a reasonable doubt .... the State's attorney ... said that I was wrong about the burden of proof and that it was not

beyond a reasonable doubt." The State, in its answer, said, "I'm still of the firm belief that it is by a preponderance of the evidence. ... The Court felt like it was preponderance of the evidence."

**5.** Roberts said he was testifying at the request of Reynolds' family. He did finally say that, from his conversations with Reynolds, he was aware that Reynolds had been to prison.

yond a reasonable doubt. *Bluitt v. State,* 137 S.W.3d 51, 54 (Tex.Crim.App.2004). Judge Johnson had opined in an earlier concurring opinion that, even for enhancement purposes, the State is not required to prove the defendant guilty of each element of the prior convictions alleged; since that has already been done at previous trials. Rather, the prosecution is required to prove beyond a reasonable doubt that the defendant on trial is the same defendant named in each of the alleged felony convictions. *Martinez,* 4 S.W.3d at 761 (Johnson, J., concurring). The most recent pronouncement of the Texas Court of Criminal Appeals regarding enhancement allegations states that, "To establish that a defendant has been convicted of a prior offense, the State must prove beyond a reasonable doubt that (1) a prior conviction exists, and (2) the defendant is linked to that conviction." *Flowers,* 220 S.W.3d at 921–22.

■ Where, as here, there was no proper objection to the charge, an appellant must prove he or she has suffered egregious harm such that the appellant did not receive a fair and impartial trial. *Martin v. State,* 200 S.W.3d 635, 639–40 (Tex.Crim.App.2006) (citing *Almanza,* 686 S.W.2d at 171). In determining whether egregious harm occurred, we review the error "in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record … as a whole." *Skinner v. State,* 956 S.W.2d 532, 544 (Tex.Crim.App.1997) (quoting *Almanza,* 686 S.W.2d at 171). Errors resulting in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory, or make the case for conviction or punishment clearly and significantly more per-

suasive. *Hutch v. State,* 922 S.W.2d 166, 171 (Tex.Crim.App.1996) (citing *Almanza,* 686 S.W.2d at 171); *Saunders v. State,* 817 S.W.2d 688, 692 (Tex.Crim.App.1991); *Washington v. State,* 59 S.W.3d 260, 265 (Tex.App.-Texarkana 2001, pet. ref'd); *Hall v. State,* 937 S.W.2d 580, 583 (Tex. App.-Texarkana 1996, pet. ref'd). In some cases, the charge itself will demonstrate egregious harm. *Hutch,* 922 S.W.2d at 172. We will examine the issues in determining if the error was egregious.

### A. The Charge Itself

■ The charge in question is the punishment charge wherein the jury was instructed that the defendant was charged with having been previously convicted of the offenses of burglary of a habitation and possession of a firearm by a felon. The jury was further instructed that, on a finding of true for both enhancement allegations, the appropriate punishment range was from twenty-five to ninety-nine years or life; if only one enhancement was found to be true, the range was two to twenty years and a fine not to exceed $10,000.00. Attempted indecency with a child by contact carried a punishment of two to ten years and a fine not to exceed $10,000.00. The jury was not instructed that the State had to prove the enhancement paragraphs beyond a reasonable doubt or by any other standard. Later in the punishment charge, the jury was instructed that extraneous crimes or bad acts "other than the one charged in the indictment in this case" must be proved beyond a reasonable doubt. In the guilt/innocence charge, the jury had been instructed many times that the proof required was beyond a reasonable doubt.

Even though the jury was instructed that extraneous offenses had to be proved beyond a reasonable doubt, that instruction also limited that requirement to crimes other than the one charged in the

indictment. Complicating this matter even further, the enhancement allegations in this instance were contained in the indictment. The enhancement allegations contained in the indictment were read in the jury's presence, and Reynolds entered a plea of not true. A jury, if following the jury charge carefully, could have considered that the requirement of proof beyond a reasonable doubt applied only to offenses that were not a part of the indictment. Even if the jury was inclined to think the extraneous offense instruction also applied to the enhancement allegations, the jury was specifically disabused of this notion when the State told the jury that it did not have to prove the enhancement allegations beyond a reasonable doubt and the court then overruled Reynolds' objection, leaving the jury with the impression that the State's argument was correct. Further, the instruction concerning extraneous offenses was not in the application paragraph.

We contrast this case to the recent Texas Court of Criminal Appeals' opinion in *Olivas v. State,* 202 S.W.3d 137 (Tex.Crim. App.2006), in which the jury was not charged that the State had to prove, beyond a reasonable doubt, that the defendant used a car as a deadly weapon. *Id.* at 139. In finding that the error did not cause egregious harm, an important factor was that the error occurred during the guilt/innocence stage of the trial where the jury had been instructed that the State had to prove the elements of the case beyond a reasonable doubt and no other standard was ever mentioned. *Id.* at 146. In *Olivas,* the jury could refer to the general instructions which required proof beyond a reasonable doubt. Here, the charge presented to the jury at the punishment stage gave no such general instructions.

## B. The State of the Evidence, Including Contested Issues and the Weight of the Probative Evidence

The State contends the punishment evidence was "overwhelming." The State presented sufficient evidence that Reynolds was the same person who had previously been convicted as alleged. This included pen packets concerning Reynolds that contained judgments of convictions for the alleged enhancement charges. Additionally, the exhibits contained fingerprints and a picture from the TDCJ. The expert witness testified that the fingerprints taken at the TDCJ matched the known prints he took from Reynolds at the courthouse. Additionally, the jury saw two pictures of the inmate taken at the TDCJ that it could compare to the defendant present in court. The use of fingerprint comparisons and pictures of the defendant are recognized methods of proving the defendant is the person who committed the previous crimes. *Littles v. State,* 726 S.W.2d 26, 32 (Tex.Crim.App.1984) (op. on reh'g). No contrary proof was presented, and Reynolds does not argue that the evidence presented was insufficient. Reynolds points out that, although the fingerprint expert, Stidham, identified the fingerprints from the TDCJ as belonging to Reynolds, he could not identify all of the fingerprints that were on the judgments. *See* TEX. CODE CRIM. PROC. ANN. art. 38.33 (Vernon 2005) (requiring a clerk, bailiff, or other qualified person to take defendant's thumbprint to be placed on the judgment). Stidham agreed that many times such prints are smudged and illegible. He further stated he matched one of the four fingerprints on the two judgments to Reynolds, but not the other three.

However, Stidham merely stated he could not match the other fingerprints on the judgment with Reynolds; he did not explain whether that was because the fin-

gerprints were illegible or because the markings were dissimilar.

## C. The Arguments of Counsel

The fact that the fingerprint expert could not match Reynolds' fingerprints with those on the judgments created an opportunity for the defense counsel to argue that the State had not proved the enhancement allegations beyond a reasonable doubt. When Reynolds' attorney made that argument, an objection was lodged that it was "outside the Jury Charge," but there was no ruling. A few minutes later, the trial court directed the attorneys to the bench for a conference. Unfortunately, there is no record of the following bench conference.[6] However, immediately after the bench conference, the defense attorney recast his argument that the State had not proven the enhancement allegations "even ... by a preponderance of the evidence." He continued to argue that the fingerprints did not all match Reynolds' fingerprints.

The State's first statement in its closing argument was, "You know, it's not beyond a reasonable doubt. It's not in the Jury Charge. Take it back with you and read it. He was wrong about that.... It's not in there." The trial court then overruled defense counsel's objection that "there is nothing in the Charge, whatsoever, and I think we should just leave it at that." The State's argument emphasized the error and exacerbated the problem now before us.

In *Olivas*, both the State and the defense stated to the jury that the State was required to prove the deadly weapon charge beyond a reasonable doubt. Additionally, in *Olivas*, when the defense ar-

gued that the beyond-a-reasonable-doubt standard was proper, "no one suggested that defense counsel's statement was incorrect or incomplete." 202 S.W.3d at 148. In contrast, here, the State strongly objected to such argument, disagreed with the standard to be used, and emphasized to the jury that it had not been instructed by the court that the State must prove the enhancement allegations beyond a reasonable doubt.

This situation is more analogous to *Ngo v. State*, 175 S.W.3d 738, 751 (Tex.Crim. App.2005), where the charge was erroneous, and the error was aggravated by the State affirmatively misstating the law during jury argument.[7]

## D. Other Relevant Information Revealed from the Record of the Trial as a Whole

In this case, the enhancement provisions were invoked. By its verdict, the jury found that Reynolds had been previously convicted as alleged in both enhancement allegations. As a result, the maximum punishment was raised from ten years to life imprisonment and the jury assessed a punishment of ninety-nine years.

It is also important to note that the error occurred in the application paragraph of the punishment charge. "The application paragraph is that portion of the charge which authorizes the jury to act." *Hutch*, 922 S.W.2d at 172 (citing *Jones v. State*, 815 S.W.2d 667, 669 (Tex.Crim.App. 1991)). Here, the jury was authorized to find "true" to the allegations with no guidance as to the standard by which the proof should be judged.

---

6. It is the duty of the court reporter to make a full record of the proceedings unless excused by agreement of the parties. Tex.R.App. P. 13.1(a).

7. In *Ngo*, the charge omitted a unanimous verdict requirement and the jury was told unanimity was not required—egregious harm was found.

Even though Reynolds does not challenge the sufficiency of the evidence, he pled not true to the enhancement allegations, thus requiring the State to prove them as mandated by law. The fact that the expert witness did not attempt to explain why the fingerprints on the judgments did not match Reynolds' fingerprints allowed a plausible argument that the link between Reynolds and the convictions was not shown beyond a reasonable doubt. To demonstrate that egregious harm occurred, it is not necessary to show that, but for the error, the outcome of the trial would have been different. The issue is whether Reynolds was denied a substantial right,[8] or if it vitally affected a defensive theory. The level of proof required for a jury to act on the enhanced punishment allegations is a substantial right. Not only was this jury not properly instructed on the level of proof required, the misstatements of the law by the State compounded the impact of the omission. This is not a case where the charge inadvertently omitted a technical requirement which was never mentioned. Here, the very basis of Reynolds' case on punishment was whether the jury found the enhancement allegations true. The jury did not have the proper test for making such decision; the final argument heard by the jury, uncorrected by the court, was that the State did not have to prove the enhancement charges beyond a reasonable doubt and that the defense attorney was wrong when he argued the jury should use that standard of proof. But he was not wrong.

Further, no instruction to the jury corrected the misstatement of law even after the jury began deliberations and specific objections were presented. We have examined this error using the egregious harm construct. However, a relevant consideration here is that the trial court had an opportunity to correct this error and failed to do so. The trial court has the authority to correct a jury charge even after deliberations have begun, if the trial court is convinced the charge is erroneous. *Smith v. State*, 898 S.W.2d 838, 854–55 (Tex.Crim.App.1995) (citing *Bustillos v. State*, 464 S.W.2d 118, 125 (Tex.Crim.App. 1971)). The *Almanza* rule is largely premised on the principle that, if an error is committed in the jury charge, a party should complain and allow the trial court an opportunity to remedy the error.[9] Here, the error was called to the trial court's attention when it had the authority to correct a clear error.

Finally, we contrast this case to other cases in which the proper standard of proof has been omitted as to extraneous offenses. Egregious harm is not shown in many of those instances because the burden of proof requirement was never mentioned to the jury. *See McClenton v. State*, 167 S.W.3d 86 (Tex.App.-Waco 2005, no pet.); *Bolden v. State*, 73 S.W.3d 428 (Tex.App.-Houston [1st Dist.] 2002, pet. ref'd); *Yates v. State*, 917 S.W.2d 915 (Tex. App.-Corpus Christi 1996, pet. ref'd). Another factor is whether the defendant is assessed punishment at the lower end of the range. *Johnson v. State*, 181 S.W.3d 760 (Tex.App.-Waco 2005, pet. ref'd); *Bolden*, 73 S.W.3d at 432; *Arnold v. State*, 7 S.W.3d 832 (Tex.App.-Eastland 1999, pet. ref'd). These cases do not address the issue in this case. Bad acts or unadjudicated extraneous offenses may be consid-

---

8. The denial of a unanimous verdict was found to deny the defendant of a valuable right, thereby constituting egregious harm. *Stuhler v. State*, 218 S.W.3d 706 (Tex.Crim. App. Jan. 24, 2007).

9. This principle encourages the timely correction of errors. *See Igo v. State*, 210 S.W.3d 645, 647 (Tex.Crim.App.2006).

ered by a jury in assessing punishment, but they do not elevate the range of punishment as do these enhancement allegations. Further, as we have discussed, the issue of the standard of proof became a focal point of the arguments of counsel in this case and the defendant was assessed a punishment of ninety-nine years.

We find that the error in this charge resulted in egregious harm. Reynolds was denied the valuable right to have the jury instructed that, in order to enhance his punishment, the State was required to prove beyond a reasonable doubt that he had been previously convicted as alleged; he was denied that right when he was prevented from arguing the proper standard of proof; the denial was further advanced when the State affirmatively misstated the law to the jury and the trial court overruled an objection to such argument; finally, the trial court failed to correct the charge error at a time when it had the authority to make such a correction. After considering the charge itself, the weight of the probative evidence, the jury argument, and other relevant factors, we find this error caused egregious harm.

## II. Smeadley's Testimony to Child's Ultimate Truthfulness

In his second point of error, Reynolds complains that State's witness Kathy Smeadley,[10] the program director of the Northeast Texas Child Advocacy Center, offered testimony which amounted to Smeadley's opinion that the child complainant in this case was telling the truth in her allegations against Reynolds. Reynolds complains that several portions of Smeadley's testimony amounted to her giving an expert witness opinion of the ultimate truthfulness of the complainant. Reynolds also complains about a specific answer to a question from the State on redirect examination, where Smeadley answered that she believed the child, beyond a reasonable doubt.

 It is improper for a witness to offer testimony about the truthfulness of a class of people. *See Yount v. State*, 872 S.W.2d 706, 712 (Tex.Crim.App.1993). "It is generally improper for a witness to offer a direct opinion as to the truthfulness of another witness and such opinion is therefore inadmissible evidence." *Blackwell v. State*, 193 S.W.3d 1, 21 (Tex.App.-Houston [1st Dist.] 2006, pet. ref'd) (citing *Schutz v. State*, 957 S.W.2d 52, 59 (Tex.Crim.App. 1997) (holding testimony that complainant did not exhibit evidence of fantasizing and thus manipulation was a less likely explanation for complainant's allegations, and that complainant's allegations were not result of fantasy constituted direct comments on truth of allegations)).[11] This type of testimony is inadmissible "because it does more than 'assist the trier of fact to under-

---

10. The witness' name is spelled "Smeadley" in the reporter's record. However, this same witness has testified several times in cases reviewed by this Court and the Twelfth District Court of Appeals, where her name has been spelled "Smedley." *See Brown v. State*, 189 S.W.3d 382 (Tex.App.-Texarkana 2006, pet. ref'd); *Wright v. State*, 154 S.W.3d 235 (Tex.App.-Texarkana 2005, pet. ref'd); *Matthews v. State*, 152 S.W.3d 723 (Tex.App.-Tyler 2004, no pet.); *Carlock v. State*, 99 S.W.3d 288 (Tex.App.-Texarkana 2003, no pet.).

11. However, an expert's testimony that a child did not exhibit the traits of manipulation is not a direct comment on the truth of the child's allegations and thus is admissible. *Schutz*, 957 S.W.2d at 73. It has also been held that a court may admit expert testimony that a child exhibits behavioral characteristics that have been empirically shown to be common among children who have been abused as substantive evidence under Rule 702. *Perez v. State*, 113 S.W.3d 819, 832 (Tex.App.-Austin 2003, pet. ref'd); *Hitt v. State*, 53 S.W.3d 697, 707 (Tex.App.-Austin 2001, pet. ref'd); *see* Tex.R. Evid. 702.

stand the evidence or to determine a fact in issue'; it *decides* an issue *for* the jury." *Yount,* 872 S.W.2d at 709. This rule applies to expert and lay witness testimony alike. *Fisher v. State,* 121 S.W.3d 38, 41 (Tex.App.-San Antonio 2003, pet. ref'd); *Arzaga v. State,* 86 S.W.3d 767, 776 (Tex. App.-El Paso 2002, no pet.).

## A. Reynolds' Complaints About Smeadley's Qualifying Testimony

 When the State questioned Smeadley about her procedures and protocols in interviewing children, she stated that her goal was to determine the truth. Reynolds' complaint seems to be that, because Smeadley used the word "truth" in some of her answers,[12] her testimony thus amounted to a comment on the verity of the complainant's allegation. Reviewing the entire record, Smeadley's statements were appropriate because she was explaining how she interviews children and the steps taken to ask nonleading questions and allow the child to tell their own story. *See generally Kelly v. State,* 824 S.W.2d 568 (Tex.Crim.App.1992). As for Reynolds' complaint that Smeadley commented on the complainant's truthfulness when Smeadley said she saw no indications the child had been coached, we disagree. It is not error for a social worker to opine that a child was not fantasizing when the child related allegations of sexual abuse during a forensic interview. *Perez v. State,* 925 S.W.2d 324, 328 (Tex.App.-Corpus Christi 1996, no pet.). Likewise, we fail to see how testimony that, in an expert witness' opinion, the child does not exhibit indications of coaching would constitute an opinion on the child's ultimate truthfulness. *See also Schutz,* 957 S.W.2d at 73.

## B. Smeadley Said She Believed Complainant, Beyond a Reasonable Doubt

 Reynolds' attorney conducted a vigorous cross-examination of Smeadley which included a question asking whether Smeadley could "guarantee" to the jury or could "stake [her] life" that the child had told the truth in her accusations against Reynolds. Defense counsel also asked, "[Y]ou sure can't guarantee beyond a reasonable doubt that all of this is true?" Each of these questions drew an objection from the State. Further, she was asked several times in different ways a question such as, "But you can't testify that the child told the truth?" Following this line of cross-examination, the State asked if Smeadley believed the child "beyond a reasonable doubt." On her affirmative answer, Reynolds objected and asked the trial court to instruct the jury to disregard Smeadley's statement. The trial court sustained Reynolds' objection and instructed the jury to disregard the question and not consider it for any purpose. Reynolds' request for a mistrial was denied.

We agree with the State's argument that Reynolds opened the door to this question. In his cross-examination of Smeadley, Reynolds pointed out that the complainant was not under oath when she was interviewed by Smeadley. The line of questioning continued (by Reynolds' attorney): "If I was a reasonable person, could I stake my life on the fact that you—this child was telling the truth?" "But you can't testify that the child told the truth?" "And you can't stake your life on that fact [that the child told the truth in Smeadley's interview], can you?" This section of Reynolds' cross-examination concluded:

---

**12.** I.e., "We're there to just find the truth, if the child has been ... abused ...." and, "We ask them if they're willing to tell the truth

....''; "we're not trying to get the child to say anything but the truth."

Q ... There's some room for doubt, isn't there, in whether or not this child has spoken the truth? Is that true?

A Not true to me.

Q But you can't guarantee it, can you?

A I can say that she told me she understood the truth—

■■■ "It is well established that the evidence which is used to fully explain a matter opened up by the other party need not be ordinarily admissible." *Parr v. State*, 557 S.W.2d 99, 102 (Tex.Crim.App. 1977). It is possible, however, to exceed the scope of such an invitation. *See also Bush v. State*, 773 S.W.2d 297, 301 (Tex. Crim.App.1989). Looking at the entire line of questioning in context, we find that Reynolds opened the door to the State's otherwise inappropriate question.

■■■ We also point out that, when Reynolds objected to this question and answer, the trial court granted his request to instruct the jury not to consider it. The trial court then denied Reynolds' request for a mistrial. The jury is presumed to follow instructions, and the efficacy of the trial court's instruction to disregard is likewise presumed. *See Livingston v. State*, 739 S.W.2d 311 (Tex.Crim.App.1987); *Carter v. State*, 614 S.W.2d 821 (Tex.Crim. App. [Panel Op.] 1981) (an instruction to disregard normally cures error, except in extreme cases where it appears that evidence is clearly calculated to inflame minds of jurors and is of such character as to suggest the impossibility of withdrawing impression produced on jurors' minds).

Reynolds cites *Nenno v. State*[13] for the proposition that an instruction to disregard will not cure any harm to the defendant where an improper question was so inflam-

matory that the instruction could not withdraw the impression from the jurors' minds. Again, after reviewing the entire record, including the numerous instances when defense counsel inquired if Smeadley could guarantee that the child was telling the truth, we cannot say this question by State's counsel, in this context, was so inflammatory as to defeat the presumption that the jury followed the trial court's instruction to disregard the State's question. We overrule this point of error.

## III. Smeadley Was a Proper Outcry Witness

■■■ Reynolds complains that the trial court erred in allowing Smeadley to testify as an outcry witness. Article 38.072 of the Texas Code of Criminal Procedure provides that a child victim's hearsay statement about the offense is admissible in certain circumstances. Article 38.072 provides as follows:

> Sec. 2. (a) This article applies only to statements that describe the alleged offense that:
>
> (1) were made by the child against whom the offense was allegedly committed; and
>
> (2) were made to the first person, 18 years of age or older, other than the defendant, to whom the child made a statement about the offense.

TEX.CODE CRIM. PROC. ANN. art. 38.072, § 2 (Vernon 2005). The statement by the child must "in some discernible manner describe[ ] the alleged offense." *Garcia v. State*, 792 S.W.2d 88, 91 (Tex.Crim.App. 1990). The proper outcry witness is not to be determined by comparing the statements the child gave to different individuals and then deciding which person re-

---

**13.** 970 S.W.2d 549 (Tex.Crim.App.1998), *overruled in part on other grounds by State v.* *Terrazas,* 4 S.W.3d 720 (Tex.Crim.App.1999).

ceived the most detailed statement about the offense. *Thomas v. State,* 1 S.W.3d 138, 141 (Tex.App.-Texarkana 1999, pet. ref'd).

On August 4, 2004, thirteen months before trial, the State filed three notices of outcry witnesses. The State's first notice stated that Kim Basinger was told by F.S. that F.S. was "raped" by Reynolds, who touched her "private and upper areas. [F.S.] said that it hurt when … Reynolds touched her 'private spot' with his hand." The second notice stated that Kathy Smeadley (spelled "Smedley" in the notice) was told by F.S. that Reynolds touched F.S. "on the breast and private area on the *outside of her clothing with his hands*" and he "attempted to put his hand down [F.S.'s] pants and tried to put [F.S.'s] hand on his private." Finally, the State alleged that Teri Stone, F.S.'s mother, was told by F.S. that Reynolds "fondled [F.S.] through her clothing in her genital area."

Stone testified that her other daughter, C.S., approached Stone and told her that, three days after the children stayed the night with Reynolds, he had engaged in sexual contact with C.S. At that time, F.S. came in the room and said, "Mama, I know what you're talking about, and he done it to me, too." Stone said she then took the girls to the police station, where she told them to tell the truth. On cross-examination, Stone said she was not sure and did not remember exactly what F.S. had told Stone that Reynolds had done to her. Stone testified F.S. told her that "[Reynolds] had offered her money if she would touch him." In answer to where F.S. had told Stone that Reynolds touched F.S., Stone answered, "I think her breasts and—just rubbing on her and stuff and touched her breasts." Stone said she did not think F.S. said she had been touched between her legs in her genital area. She

said she did not remember what F.S. had said, word for word, and that she told the police what she believed F.S. had told her. In answer to a direct question from the trial court, Stone said she did not remember where F.S. said she had been touched.

Smeadley interviewed F.S. after F.S. had spoken to the police. Smeadley testified that F.S. told her that Reynolds touched "her private and her chest." The private area referred to her vagina, and the chest area referred to her breasts. Smeadley further testified that F.S. told her Reynolds touched her while in the bathroom, "with his hand inside her clothes and close to her private." F.S. said Reynolds "wanted her to touch his private, and [F.S.] described that he was forcing her hand to touch his private."

 In *Broderick v. State,*[14] the mother testified the child complainant told her that Broderick "touch[ed] me," and made a back and forth motion, with her hand, in the area of the child's genitals. *Broderick,* 35 S.W.3d at 73. Later, the child gave a much more detailed statement to a police officer; she told the officer that Broderick had felt and licked her, and wanted her to "suck him back." *Id.* In *Broderick,* we acknowledged that the outcry statute is event-specific, rather than person-specific. That is to say, "[T]here may be two proper outcry witnesses if they each testify about different events, but there may be only one outcry witness to the victim's statement about a single event." *Id.* The police officer was the proper outcry witness as to one offense, and the child's mother was the proper outcry witness as to the other offense. *Id.* at 74; *see also Hernandez v. State,* 973 S.W.2d 787, 789 (Tex. App.-Austin 1998, pet. ref'd) (when child describes to different witnesses discrete

---

**14.** 35 S.W.3d 67 (Tex.App.-Texarkana 2000, pet. ref'd).

events occurring at different locations and times, each witness may testify to outcry).

In the instant situation, the trial court heard testimony from both Stone and Smeadley, outside the jury's presence, and took notice of the State's notices of outcry witnesses. The indictment for cause number 417629 charged Reynolds with two counts of indecency with a child, the first alleging he had touched F.S.'s genitals, the second, that he had touched her breasts. Stone did not remember being told that F.S. had told her Reynolds touched F.S. in the genital area. This despite the fact the State's notice of outcry witness asserted that Stone's testimony would be that F.S. had told Stone that Reynolds touched her in the genital area but apparently did not mention touching of the breasts.[15] Smeadley, on the other hand, related F.S.'s allegations which went to both offenses in the indictment alleging criminal acts by Reynolds against F.S. (as opposed to trial court cause number 417630, which alleged criminal acts perpetrated against C.S.). After substantial, lengthy argument from counsel, the trial court ruled that both Stone and Smeadley were outcry witnesses. The trial court noted that, regarding F.S., there were two distinct crimes alleged: touching of the breasts and touching of the genitals. The trial court said Stone was the outcry witness as to one offense, though it did not say which (presumably the touching of the breasts since Stone never testified that she remembered any report of Reynolds touching F.S.'s genital area).

The trial court then heard testimony from Smeadley and ruled Smeadley could testify as an outcry witness. When Reynolds' attorney asked if she would be the outcry witness as to F.S.'s allegation of touching of the breasts or genitals, the trial court said, "I'm going to allow her to tell whatever the child told her . . . . it may not make sense to the jury if we only take up—if we try to differentiate it." Defense counsel then stated he objected to Smeadley testifying to the offense involving the genital area and agreed that she could testify as to the offense involving the chest area.

 Pursuant to Article 38.072, in a case alleging that sexual assault or a sexual offense was committed against a child under the age of thirteen, an exception to the hearsay rule exists to allow testimony by the first person over eighteen years of age, other than the defendant, "to whom the child made a statement about the offense." TEX.CODE CRIM. PROC. ANN. art. 38.072; *Martinez*, 178 S.W.3d at 810–11 & n. 13–15 (discussing policy basis of exception). This adult is designated as the "outcry witness." *Jones v. State*, 92 S.W.3d 619, 621 (Tex.App.-Austin 2002, no pet.). Generally speaking, the exception is available for only one witness, unless the child revealed discrete occurrences of the same offense, or revealed different offenses, to separate adults. *Broderick*, 35 S.W.3d at 73; *Hernandez*, 973 S.W.2d at 789. The statute has further been interpreted to mean that the "first person" refers to the first adult who can remember and relate at trial the child's statement that, in some discernible manner, describes the alleged offense. *Foreman v. State*, 995 S.W.2d 854, 859 (Tex.App.-Austin 1999, pet. ref'd). The admissibility of evidence is within the sound discretion of the trial court. *Williams v. State*, 958 S.W.2d 186, 195 (Tex.Crim.App.1997). Under an abuse of

---

15. Stone also acknowledged, in her testimony, selling drugs, having people to her house to drink and do drugs, "dump[ing]" her children off with other people so Stone could pursue these activities, and that she was a "bad mom." She generally claimed a faulty memory and stated that the events under discussion had happened a year ago.

discretion standard, the trial court's decision to admit the evidence must be reasonable in view of all the relevant facts. *Shuffield v. State,* 189 S.W.3d 782, 787 (Tex.Crim.App.2006). We will defer to the trial court's ruling if it is within the zone of reasonable disagreement. *Id.* at 793; *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App.1991) (op. on reh'g).

The trial court went to great lengths to determine which witness was the first to be told, by the child, of the distinct allegations. The court's decision was not made easier by the equivocations of Stone. On a review of the entire record, it is clear the trial court strove to make its decision with reference to guiding rules or principles espoused in the current case and statutory law. *See Howell v. State,* 175 S.W.3d 786, 792 (Tex.Crim.App. 2005). Stone testified she did not remember F.S. telling her anything about the offense which alleged touching of the genitalia. Even though Stone had given a report to the police concerning the touching of the genitalia, since her testimony at trial was that she did not remember F.S. reporting that to her, she would not qualify as the outcry witness regarding the offense involving the genital area. *See Foreman,* 995 S.W.2d at 859. Smeadley then qualified as the first adult that F.S. told about the touching of the genitalia. Even as to the incident involving touching of breasts, Stone was equivocal. During her testimony outside the presence of the jury, she at one time said she could not recall where F.S. told her Reynolds touched her body; a police report was introduced stating that Stone reported both a touching of the breasts and genitalia of F.S.; another time during Stone's testimony, she stated the touching was, "I think her breasts—just rubbing on her and stuff and touched her breasts." Stone's testimony to the jury was:

Q Did she say where he touched her?

A I don't remember.

Q So you don't know whether it was touching her head or touching her arm or what?

A In the way she talked, I took it as touching inappropriately.

From the evidence presented, it appears Stone was at most the proper outcry witness regarding the breast touching, as she testified that F.S. reported that Reynolds touched her breasts. However, Reynolds' objection was that Smeadley was not the proper outcry witness for the offense involving the genital area. Reynolds did not object to Smeadley's testimony as to the offense involving the breast area. Since Stone never testified that she was told by F.S. of the offense involving the genital area, Smeadley qualified as the outcry witness for the offense involving the genitalia. Further, since Reynolds did not object to Smeadley's testimony regarding the touching of the breasts, no error is preserved on the admission of Smeadley's testimony about the offensive breast touching. *See* TEX.R.APP. P. 33.1.

Even if the error had been preserved, based on the wavering testimony from Stone, the trial court could have reasonably concluded either that F.S. did not report in a discernible manner either of the alleged offenses to Stone or that Stone could not remember what she was told. Accordingly, we cannot say the trial court abused its discretion. Reynolds' third point of error is overruled.

## IV. No Error in Admitting Smeadley's Testimony as an Expert

Reynolds alleges in his final point of error the trial court erred by allowing Smeadley to testify as an expert without first conducting a hearing (as cases interpreting and applying TEX.R. EVID. 702 re-

quire[16]), and further erred by allowing Smeadley to testify as an expert without a sufficient showing that her testimony was reliable. Again, Reynolds has raised a multifarious point of error. In Reynolds' brief, he has spent almost all of his analysis on the reliability issue. As for his contention that the trial court erred in not conducting a hearing before admitting Smeadley's testimony, Reynolds offers little to no analysis of this point. As he does not attempt to demonstrate how he was harmed by this purported abuse of discretion, we decline to address this allegation. Instead, we interpret his brief as complaining of the admission of Smeadley's testimony as an expert witness.

 A trial court enjoys wide latitude in determining whether expert testimony is admissible. *Hernandez v. State,* 53 S.W.3d 742, 750 (Tex.App.-Houston [1st Dist.] 2001, pet. ref'd). The trial court abuses its discretion when its decision is so clearly wrong as to fall outside the zone of reasonable disagreement or when the trial court acts arbitrarily and unreasonably, without reference to any guiding rules or principles. *Montgomery,* 810 S.W.2d at 380. A trial court's decision to admit scientific testimony likewise should not be overturned absent an abuse of discretion. *Morales v. State,* 32 S.W.3d 862, 865 (Tex. Crim.App.2000); *Wyatt v. State,* 23 S.W.3d 18, 27 (Tex.Crim.App.2000).

 Reynolds relies on the Texas Court of Criminal Appeals' ruling in *Kelly.*[17] The *Kelly* test of admissibility involved the consideration of seven factors. However, Reynolds fails to recognize that the Texas Court of Criminal Appeals has, since *Kelly,* applied a different test to nonscientific expert testimony (i.e., that involving technical or other specialized knowl-

edge). The general principles of *Kelly* apply, but the specific factors outlined in *Kelly* may or may not apply, depending on the context. As regards testimony in the field of psychology, it has generally been described as a "soft science" in Texas caselaw, as opposed to a "hard science" like psychiatry or analysis of DNA. *Muhammad v. State,* 46 S.W.3d 493, 506 (Tex. App.-El Paso 2001, no pet.) (holding that psychology falls within the ambit of "soft science" for purposes of determining reliability of expert testimony). When addressing fields of study aside from the hard sciences, such as the social sciences or fields that are based primarily on experience and training as opposed to the scientific method, *Kelly's* requirement of reliability applies, but with less rigor than to the hard sciences. *Nenno,* 970 S.W.2d at 561 (addressing differences in "hard science" fields, based on "scientific method" and "fields of study ... such as the social sciences or fields that are based primarily upon experience and training"). The reliability of "soft" scientific evidence may be established by showing that (1) the field of expertise is a legitimate one, (2) the subject matter of the expert's testimony is within the scope of that field, and (3) the expert's testimony properly relies on and/or utilizes the principles involved in the field. *Weatherred v. State,* 15 S.W.3d 540, 542 (Tex.Crim.App.2000); *Nenno,* 970 S.W.2d at 561.

## A. A Legitimate Field?

 In *Hernandez,* the Houston First District Court of Appeals stated that the field of expertise (characteristics and dynamics of sexually abused children) was "certainly" a legitimate field as recognized by *Duckett v. State,* 797 S.W.2d 906 (Tex. Crim.App.1990). *Hernandez,* 53 S.W.3d at

---

**16.** *See generally Hernandez v. State,* 116 S.W.3d 26, 29 (Tex.Crim.App.2003).

**17.** 824 S.W.2d 568.

751. Our law has recognized this field of expertise as a legitimate one. *Yount,* 872 S.W.2d at 708; *Cohn v. State,* 849 S.W.2d 817, 819 (Tex.Crim.App.1993); *Kirkpatrick v. State,* 747 S.W.2d 833, 835–36 (Tex.App.-Dallas 1987, pet. ref'd) (expert testimony admissible about general behavioral traits of child victims, e.g., delay in reporting incident); *Hernandez,* 53 S.W.3d at 751; *see also Dennis v. State,* 178 S.W.3d 172, 182 (Tex.App.-Houston [1st Dist.] 2005, pet. ref'd) (witness, a child psychotherapist and social worker, properly qualified to testify to the characteristics and dynamics of sexually abused children); *Vasquez v. State,* 975 S.W.2d 415, 417 (Tex.App.-Austin 1998, pet. ref'd) (testimony by expert witness that a child exhibits behavioral characteristics that have been empirically shown to be common among children who have been sexually abused is both relevant and admissible as substantive evidence).

## B. Within Scope of Expertise?

Smeadley was a licensed professional counselor, a licensed marriage and family therapist, and was trained in forensic interviewing. She testified she participated in regional peer review. Smeadley had been director of the Northeast Texas Child Advocacy Center for six years. She interviewed F.S. regarding F.S.'s allegations against Reynolds and testified to the jury about that interview. She evaluated F.S.'s statements to her by observing such things as F.S.'s body language, tone of voice, and facial expressions. Smeadley testified she did not observe, in the demeanor of F.S., anything to indicate to Smeadley that F.S. had been coached in her allegations. She discussed a phenomenon called delayed disclosure by victims of sexual assault. This was within the scope of her field of expertise. *See In re A.J.L.,* 136 S.W.3d 293, 299 (Tex.App.-Fort Worth 2004, no pet.) (trial court did not abuse discretion

finding play therapy to be a legitimate field of expertise).

## C. Did Smeadley's Testimony Rely on or Utilize Principles in the Field?

Smeadley testified that forensic interviewing includes a process to evaluate whether the child exhibits indications of having been coached and that she followed such practice and procedure in her interview with F.S. Smeadley listed journals and articles on which she relied for her opinions, some of which she had reread the day before and the day of her testimony. She also testified she participated in a peer review committee. The trial court could reasonably have determined that Smeadley's testimony was based on applicable principles in the field. Further, the trial court was within its discretion to find that Smeadley was qualified to testify as an expert. We overrule Reynolds' fourth point of error.

We affirm the conviction, but reverse the sentence and remand to the trial court for a new trial on punishment.